IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JEFFREY P. RHOADS, M.D.,

      Plaintiff,

v.                                                                              Case No. 22-4005-JWB

STORMONT VAIL HEALTHCARE, INC.,

      Defendant.

## MEMORANDUM AND ORDER

This matter comes before the court on Defendant's motion for summary judgment. (Doc. 46.) The motion is fully briefed and ready for decision. (Docs. 47, 50, 51, 54.) For the reasons stated herein, Defendant's motion is GRANTED.

## I.       Facts and Procedural Background

The following statement of facts is taken from the parties' submissions. Factual disputes about immaterial matters are not relevant to the court's determination. Therefore, immaterial facts and factual averments that are not supported by record citations are omitted.

Plaintiff specializes in internal medicine and served as a hospitalist at Stormont Vail Healthcare, Inc. ("Stormont Vail" or "Defendant"). His employment was dictated by the terms of a Physician Employment Agreement ("Agreement") dated October 1, 2019. The essential functions and duties of the hospitalist position and any inpatient or outpatient physician position include providing medical care to patients meeting the appropriate standard of care; exercising independent professional judgment related to care and treatment of patients; creating and recommending appropriate treatment plans; creating accurate and complete records of a patient's medical history; updating a patient's charts accurately and completely; leading and coordinating

care of patients; and performing necessary administrative tasks.  Plaintiff was required to have medical staff membership and clinical privileges to serve as a hospitalist.  (Doc. 47 at 2; Doc. 50 at 2.)

The Agreement contained a provision for termination upon disability, which set out specific terms for Plaintiff's termination if he became unable to perform the essential functions of his position with or without reasonable accommodations.  This provision also made clear that Stormont Vail would comply with applicable law and would "explore all reasonable accommodations, including possible reassignment, for a [p]hysician with a disability." (Doc. 47-1 at 11.)

Stormont Vail's Medical Staff[1] is responsible for peer review, credentialing, and quality and patient safety.  According to Stormont Vail's credentials policy, all physicians, whether employed by Stormont Vail or not, must be granted privileges to practice at Stormont Vail.  These privileges are often specific to a practitioner's specialty; for internal medicine, the specialty is a hospitalist.  Dr. Kimberly Brey was President of Stormont Vail's Medical Staff during the relevant time.[2]  Dr. Traci Cuevas and Dr. Jason Austin were co-medical directors of the adult hospitalist group during the relevant time.  (Doc. 47-15 at 3.)

In November 2020, Dr. Cuevas called Dr. Brey to convey concerns from within the hospitalist group that Plaintiff was showing signs of dementia and to inquire about next steps to protect patients.  (*Id.* at 4.)  Dr. Austin also had concerns about Plaintiff, including a steady decline in the quality of work.  Both other doctors and patients reported concerns that doctors had to start

---

[1] Neither Plaintiff nor Defendant explain exactly what the term "Medical Staff" refers to.  The Medical Staff likely refers to all of the physicians on staff at Stormont Vail, although at times it appears to refer to a specific subset of physicians, more like a leadership committee.

[2] At the time of Dr. Brey's deposition in September 2022, she indicated that she had been President of Medical Staff for almost two years.  (Doc. 47-13 at 3.)  She also noted that the position as president lasts for two years.  (*Id.*)  Today, she is likely no longer president and now likely serves in the post-president position.

completely over when taking over a patient from Plaintiff because Plaintiff had given substandard care and failed to appropriately document or provide specific treatment plans.  (Doc. 47-17 at 2–3.)  Concerns about Plaintiff dated at least as far back as 2017, although more formal reports were not made at the time.  (Doc. 54-5 at 2–3.)  The concerns reported by Drs. Cuevas and Austin were consistent with the results of testing done by Plaintiff's neurologist, Dr. Ryan Townley.  (Doc. 47-8 at 6.)  Plaintiff acknowledged that if he made a mistake with a patient, it could cause the patient harm or even lead to the patient's death.  (Doc. 47-18 at 8–9.)

Because of the reported concerns about Plaintiff, and per Stormont Vail's policy, Dr. Brey formed a Physicians' Health and Advocacy Subcommittee (the "Committee") to work through concerns about Plaintiff.  (Doc. 47-16 at 2; Doc. 47-19.)  The Committee met and discussed Plaintiff and then recommended a temporary and precautionary restriction of Plaintiff's clinical privileges until an evaluation of his cognitive abilities could be completed.  (Doc. 47-16 at 3.)  Plaintiff was referred to Acumen Assessments, Inc. ("Acumen") for evaluation.  (*Id.*; Doc. 47-3 at 2.)  Plaintiff scheduled an appointment with Acumen but was unable to be seen until January 4, 2021.  (Doc. 47-3 at 2; Doc. 47-16 at 3.)  Plaintiff worked his last shift as a hospitalist at Stormont Vail on November 24, 2020.  (Doc. 45 at 2.)

Plaintiff began taking leave protected by the Family and Medical Leave Act ("FMLA") on January 11, 2021.  He also submitted a request for a 30-day leave of absence on January 12, 2021, which was granted.  Then on February 3, 2021, Plaintiff submitted a request to the Medical Staff for a leave of absence of up to one year for health reasons.  That request was also granted.  (*Id.* at 2–3.)  Plaintiff was paid his full base salary until February 10, 2021.  He was paid 50% of his base salary from February 11, 2021, until the end of his FMLA leave.  (*Id.* at 3.)

In January 2021, Plaintiff received an evaluation from Acumen which indicated "mild-moderate impairment in multiple areas of cognitive function." (Doc. 47-3 at 5.) Plaintiff was diagnosed with Mild Neurocognitive Disorder and was not considered fit to practice medicine at that time. (*Id.* at 10.) Plaintiff also agreed that he likely would not be able to return to his work as a hospitalist. (Doc. 47-18 at 4–5.)

Plaintiff's appointment of clinical privileges was due to expire on August 31, 2021, and Plaintiff was required to apply for reappointment on or before that day. (Doc. 47-21 at 3–4.) Plaintiff did not reapply by that date, which is considered a voluntary withdrawal under Stormont Vail's policy. (*Id.*; Doc. 47-14 at 11.) In order to work as an outpatient physician at Stormont Vail, Plaintiff would have needed to apply for clinical privileges as an outpatient physician.[3] (Doc. 47-13 at 12.) Plaintiff testified at his deposition that he did not apply for those privileges because he was afraid that he would not be accepted, and if he was denied privileges, he would be reported to the Kansas Board of Healing Arts which would cause him additional problems. (Doc. 47-18 at 7.) Plaintiff additionally contends that he did not apply for outpatient privileges because he had not been offered a job as an outpatient physician. (Doc. 50 at 5–6.)

There are two branches overseeing physicians at Stormont Vail: the Medical Staff branch and the administration branch. Dr. Brey was the president of the Medical Staff. The Medical Staff made decisions regarding credentialing for physicians employed by the hospital doing inpatient work. Dr. Dishman is the Chief Medical Officer, near the top of the leadership of the administration branch. Dr. Kenagy is the President and Chief Executive Officer at the top of administration. The administration side is in charge of employment decisions, and Dr. Dishman

---

[3] There is some dispute between the parties as to whether Plaintiff needed to first apply for outpatient privileges and then a position as an outpatient physician or vice versa. (Doc. 47 at 6; Doc. 50 at 5–6; Doc. 54 at 2.)

was the decisionmaker related to Plaintiff's employment.  (Doc. 47-13 at 16–17; Doc. 47-22 at 3, 8–9, 11–14.)

Before Dr. Dishman could allow Plaintiff to return to work following Plaintiff's FMLA leave, Dr. Dishman needed to know that Plaintiff could safely return to work and needed to understand what Plaintiff's capabilities and restrictions were in order to create a plan for Plaintiff's return.  (Doc. 47-22 at 9–10, 15, 21.)  To create a plan for Plaintiff's return and to assess what Plaintiff could safely do, Dr. Dishman asked Plaintiff to complete a fitness for duty assessment with Dr. Soni Mathew, Director of Occupational Health.  (Doc. 47-23 at 3.)  Dr. Dishman testified at his deposition that he was concerned about the lack of specificity as to a plan for how Plaintiff could return to work, asking questions such as what Plaintiff was able to do with and without accommodations and what hours he would be able to work.  (Doc. 47-22 at 21.)

Dr. Mathew evaluated Plaintiff, reviewed his medical records, and recommended that Acumen perform an updated evaluation and provide specific recommendations as to Plaintiff's ability to perform the essential functions of his job and any necessary accommodations.  (Doc. 47-9 at 2–3.)  Plaintiff was frustrated with Dr. Mathew's recommendations.  (Doc. 47-24.)  Dr. Dishman discussed Plaintiff's condition with Dr. Mathew which is when Dr. Dishman determined that the further evaluation by Acumen or the University of Kansas ("KU") was necessary.  (Doc. 54-8 at 3–4.)

Plaintiff felt as if the evaluation with Acumen was complete, and he did not need to return to Acumen for further evaluation.  Plaintiff declined to return to Acumen.  (Doc. 51 at 24.)  Dr. Brey had a conversation with Plaintiff around May 4, 2021, in which she explained to Plaintiff that she "believed the evaluation was completed as well through Acumen and [she] was not aware of a reason that he needed to be seen or evaluated by Acumen again."  (Doc. 47-35 at 4.)  But Dr.

Brey also reminded Plaintiff that "the issue with Dr. Matthew is from administration and they would need to answer those questions." (*Id.*)  Dr. Dishman offered Plaintiff two weeks of pay to be evaluated by Acumen and to work with them to come up with a solution that would allow Plaintiff to return to work, with or without accommodations.  (Doc. 47-22 at 18–19.)  Plaintiff declined the offer.  (Doc. 47-25 at 2.)

Plaintiff and Stormont Vail continued engaging in the interactive process through their attorneys from this point forward.  While engaging in the interactive process, Plaintiff's attorney admitted that Plaintiff could not return to Stormont Vail as a hospitalist, but instead requested an accommodation so that Plaintiff could work as an outpatient physician.  (Doc. 47-28 at 2–3.)  Plaintiff, based on some of the recommendations of his healthcare providers, took the position that as a reasonable accommodation, he should work with an Advanced Practice Registered Nurse ("APRN") or Physician's Assistant ("PA") for supervision and to ensure patient safety.  (Doc. 47-18 at 24–27.)  It would cost Stormont Vail between $112,050.00 and $225,432.00 to hire an APRN or PA to do this type of work.  To hire a hospitalist or outpatient physician to work with Plaintiff, it would cost Stormont Vail between $458,625.00 and $1,473,958.00.  (Doc. 47-34 at 2–3.)

Stormont Vail has a process called proctoring.  Proctoring happens when a new physician initially gets privileges at Stormont Vail and is sometimes used at other times.  The proctoring process generally involves one physician looking over documents for another physician but is not technically oversight.  This must be done by a peer, i.e., one physician looks over another physician's work, but a PA or APRN could not look over a physician's work.  (Doc. 54-1 at 5; Doc. 54-4 at 4–5.)

Plaintiff also requested reassignment to an administrative position which would not require patient care as a reasonable accommodation.  (Doc. 47-26 at 2; Doc. 47-33 at 6.)  At some point

during discussions, Plaintiff told Dr. Brey that he wanted to be the best paid copy boy ever.  (Doc. 47-18 at 15–16; Doc. 47-35 at 3.)  On July 1, 2021, Plaintiff filed a charge of discrimination against Stormont Vail.  (Doc. 45 at 3.)

On July 2, 2021, Stormont Vail's attorney requested a conference call with Plaintiff and his attorney to discuss potential reassignment to an administrative position, but that conference call never occurred.[4]  (Doc. 47-18 at 17–18; Doc. 47-29 at 2, 4–5.)  Plaintiff's attorney sent Stormont Vail's attorney a letter on September 14, 2021, discussing either reassignment to an outpatient position with supervision or a monetary payment to Plaintiff.  (Doc. 47-32 at 2–3.)  This letter came one day before the September 15 mediation of Plaintiff's discrimination charge and does not mention reassignment to an administrative position.  (*Id.*; Doc. 47-34 at 6.)  At the mediation, Plaintiff and Stormont Vail discussed an open position as a door screener at the hospital, which would have paid only $15 per hour.  (Doc. 47-34 at 5.)  Many of the other vacant positions would have required licenses that Plaintiff did not have.  (*Id.*)  Plaintiff graduated with his undergraduate degree in business administration in 1978 but has never worked in an administrative capacity and has not recently taken any courses in administration.  (Doc. 47-28 at 12; Doc. 54-9 at 3–5.)

In June or July 2021, Plaintiff asked Dr. Townley for clarification on his condition and for additional testing.  In August, Dr. Townley noted in Plaintiff's medical records that Plaintiff "now has two objective biomarkers highly consistent with the working diagnosis of nonamnestic mild cognitive impairment due to suspected Lewy body disease.  These include the FDG-PET scan and the CSF synuclein test.  Neither of these tests are abnormal because of his COVID infection." (Doc. 47-11 at 10.)  Plaintiff testified at his deposition that "Alpha synuclein now has been found

---

[4] It is not clear why this call never occurred or if a call was ever scheduled.

in people with previously undetected spinal taps to appear in people with COVID." (Doc. 47-18 at 21.) Plaintiff executed releases allowing Stormont Vail access to his medical records from KU. (Doc. 51 at 24.) Plaintiff's employment with Stormont Vail was terminated on September 15, 2021. (Doc. 47-38 at 4.)

Plaintiff brought this suit on January 19, 2022, alleging failure to accommodate, retaliation, and unlawful termination under the Americans with Disabilities Act ("ADA") and Rehabilitation Act of 1973 ("RA"). (Doc. 23 at 13–15.) Plaintiff also brought a claim for breach of his employment contract. (*Id.* at 16.)

## II.    Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.    Analysis

Plaintiff brings four counts against Defendant under the RA, the ADA, and his employment contract: (1) failure to accommodate; (2) retaliation; (3) unlawful termination; and (4) breach of contract.  (Doc. 45.)

## A.  Failure to Accommodate

The court notes that Plaintiff has conceded that he could no longer work as a hospitalist and that he is only pursuing claims of failure to accommodate by reassignment.  (Doc. 47-18 at 5; Doc. 45 at 12.)  Plaintiff contends that Defendant failed to accommodate his disability when it did not reassign him to a vacant position, either in an administrative capacity or as an outpatient physician.  (Doc. 45 at 12.)  Defendant argues that it engaged in the interactive process in good faith and that Plaintiff caused a breakdown in the interactive process.  (Doc. 47 at 13–18.) Defendant also argues that there were no reasonable accommodations that would have allowed Plaintiff to continue treating patients and that Plaintiff's suggested accommodations for supervision would cause an undue burden on Defendant.  (*Id.* at 18–26.)  Plaintiff responds that he did not cause a breakdown in the interactive process and that reasonable accommodations existed that would not have caused an undue burden.  (Doc. 50 at 24–28.)

The ADA prohibits disability discrimination by employers.  42 U.S.C. § 12112(a). Disability discrimination includes failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship." *Id.* § 12112(b)(5)(A).  Claims under the ADA and the Rehabilitation Act are decided using the same substantive standards.  *Rivero v. Bd. of Regents of Univ. of N.M.*, 950 F.3d 754, 758 (10th Cir. 2020).

To establish a prima facie case of failure to accommodate by reassignment, Plaintiff must show (1) that he was disabled within the meaning of the ADA and he told Stormont Vail about his limitations; (2) that he cannot be reasonably accommodated within his current job; (3) that he requested a reasonable accommodation by reassignment to a vacant position which Plaintiff either identified or which would have been identified during the interactive process, in which Plaintiff in good faith cooperated; (4) Plaintiff was qualified to perform a vacant job with or without reasonable accommodations that was available at Stormont Vail at or around the time Plaintiff requested reassignment; and (5) Plaintiff was injured because he was not reassigned. *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 674–75 (10th Cir. 2021). If Plaintiff can make this prima facie showing, the burden shifts to Stormont Vail to either (1) conclusively rebut one or more elements of the prima facie case or (2) establish an affirmative defense. *Id.* at 674. Both parties have an obligation to engage in the interactive process in good faith, and one party cannot create or destroy liability by causing a breakdown in the interactive process. *Norwood v. United Parcel Serv., Inc.*, Case No. 19-2496-DDC-JPO, 2021 WL 3022315, at *11 (D. Kan. July 16, 2021).

The parties agree that the first two elements are not at issue. (Doc. 47 at 13; Doc. 50 at 24.) Plaintiff contends that genuine disputes of material fact exist as to the remaining elements. (Doc. 50 at 24.) Naturally, Defendant disagrees. (Doc. 47 at 13.) The court will address each position separately.

### 1. *Reassignment to Outpatient Position*

Plaintiff contends that although he could no longer serve as a hospitalist, he was still able to work as an outpatient physician with reasonable accommodations. (Doc. 50 at 25.) Defendant argues that Plaintiff caused a breakdown of the interactive process by failing to get an updated evaluation and by failing to provide Defendant with adverse medical information. (Doc. 47 at 13.)

Further, Defendant argues that Plaintiff posed a direct threat to patients and that his proposed accommodations were not reasonable and caused an undue burden. (*Id.* at 18–26.)

Plaintiff suggests that he could have worked as an outpatient primary care physician had he been paired up with another physician, an APRN, or a PA to oversee the care he provided. During the interactive process, Dr. Dishman requested that Plaintiff obtain an updated evaluation from Acumen to guide Stormont Vail in assessing what Plaintiff could do and what accommodations were necessary. Plaintiff refused to do so, believing that the evaluation Plaintiff had previously obtained from Acumen was sufficient. Defendant contends that this refusal to obtain an updated evaluation caused a breakdown in the interactive process.

Looking at the facts from Plaintiff's perspective, Plaintiff had already received an evaluation from Acumen as he was directed to by Stormont Vail. Plaintiff had also provided a release which allowed Stormont Vail to review his other medical records. Additionally, Plaintiff visited Dr. Mathew to obtain his recommendations for a return to work. Dr. Mathew could not provide those recommendations and instead recommended that Plaintiff return to Acumen. Plaintiff made a good faith effort to provide Defendant with the information it needed about his medical condition. His refusal to obtain another updated evaluation did not cause a breakdown in the interactive process where Plaintiff had complied with all of Defendant's previous requests and provided full access to his medical records. Further, Defendant and Plaintiff continued engaging in the interactive process well after Plaintiff failed to get the updated evaluation which suggests that the process had not broken down.

Defendant next contends that Plaintiff caused a breakdown in the interactive process when he failed to provide Stormont Vail with adverse medical information.[5] Plaintiff obtained updated

---

[5] In its reply, Defendant admits that it is uncontroverted that Plaintiff executed a release of his medical records at KU and linked his KU medical records to his Stormont Vail medical records. (Doc. 54 at 3.) Defendant also appears to

testing from his treating doctor at KU, Dr. Townley, in August 2021 which indicated that Plaintiff now had two biomarkers consistent with Lewy body disease. Plaintiff had previously signed a release which allowed doctors at Stormont Vail to view his medical records from KU. Stormont Vail argues that it did not know about the results of these tests until litigation began and that Plaintiff's failure to provide the records caused a breakdown in the interactive process. The court disagrees. Because Plaintiff had released his records to Stormont Vail, construing the facts in the light most favorable to Plaintiff, Defendant had access to these records while the interactive process was ongoing. Thus, this cannot have caused a breakdown in the interactive process.

Defendant argues that Plaintiff could not perform as an outpatient physician because he posed a direct threat to patient safety.[6] Plaintiff had been diagnosed with Lewy body dementia and with Mild Neurocognitive Disorder. In August 2021, tests showed that Plaintiff had two biomarkers which were consistent with Lewy body dementia. Doctors who worked with Plaintiff reported concerns about his charting and his failure to create and follow treatment plans for patients. Patients complained (informally) about the care Plaintiff provided. Plaintiff was unable to complete administrative tasks and his work had steadily declined in quality. Plaintiff himself testified that if he made a mistake or an omission it could harm a patient or even cause the patient's death.

The ADA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. §§ 12111(3); 12113(a)–(b) ("The term 'qualification standards' may include a requirement that an individual shall not pose a direct

---

abandon its argument that the failure to provide these records caused a breakdown in the interactive process. Nevertheless, the court addresses the argument here.

[6] Defendant also makes the argument that Plaintiff was not qualified to work as an outpatient physician because he did not have outpatient privileges. (Doc. 47 at 19.) The facts related to when a candidate applies for privileges (either before or after an offer of employment) are controverted. *See supra* n. 3. The court need not address this argument or the disputed facts because the court concludes that even if Plaintiff had outpatient privileges, he still could not perform the position with or without reasonable accommodations.

threat to the health or safety of other individuals in the workplace.").  "The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job."  29 C.F.R. § 1630.2(r).  Factors to consider include: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm."  *Id.*  "In evaluating an employer's direct-threat contention, the fact-finder does not independently assess whether it believes that the employee posed a direct threat.  [Rather], the fact-finder's role is to determine whether the employer's decision was objectively reasonable."  *Rohr v. Union Pac. R.R. Co.*, Case No. 19-1114-JTM, 2020 WL 5802079, at *16 (D. Kan. Sept. 29, 2020) (quoting *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007)).

The court concludes that Defendant's decision that Plaintiff posed a direct threat to patients was objectively reasonable.  A mistake by Plaintiff could have put a patient in imminent danger or even caused a patient's death, as Plaintiff admitted.  It is clear that Plaintiff posed a direct threat to patients if he was responsible for patient care.  *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 295 (7th Cir. 2015) ("It seems less reasonable to require SAHC to knowingly allow a psychologist with a documented memory impairment – whose immediate memory scored in the lowest two percent of the comparable population – to treat patients without meaningful supervision at an acute-care facility. . . .  We do not mean to suggest that concern for patient safety or fear of malpractice liability relieved SAHC of the obligation to seriously engage in the interactive process – it did not, as we have said – but we do think it is entirely proper for an employer assessing the reasonableness of a proposed accommodation to consider the sensitive nature of the employee's position and the potential safety and liability risks involved.").

A related question is whether there is a reasonable accommodation that exists which could eliminate the direct threat to patient safety.  Plaintiff contends that he could be accommodated by being supervised or paired up with an APRN or PA.  Defendant contends that this is not a reasonable accommodation and instead it imposes an undue burden upon Defendant because of the licensing issues with having a non-peer work alongside Plaintiff and because the cost of hiring such a person would be exorbitant.

Undue hardship means "an action requiring significant difficulty or expense" and is to be considered in light of several factors.  42 U.S.C. § 12111(10)(A).  The factors are:

(i)     the nature and cost of the accommodation needed under this chapter;

(ii)    the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii)   the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv)    the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

Id. § 12111(10)(B).  The factors to be considered for undue hardship under the regulations are substantially the same, but also add an additional factor for the "impact of the accommodation

upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business." 29 C.F.R. § 1630.2(p)(v).

As mentioned above, it would cost Stormont Vail between $112,050.00 and $225,432.00 to hire an APRN or PA to do this type of work.  To hire a hospitalist or outpatient physician to work with Plaintiff, it would cost Stormont Vail between $458,625.00 and $1,473,958.00.  There is no evidence in the record before the court as to Defendant's financial resources, number of people employed, or the impact of this accommodation on Defendant's operations.

Although the court is without evidence to consider many of the factors, the court finds that the first factor decides the issue.  The nature of this accommodation is not reasonable because it likely requires Defendant to engage in illegal conduct, having an APRN or PA engaging in the unlicensed practice of medicine while they supervise a physician.  K.S.A. 65-2803(a); K.S.A. 65-2869; K.S.A. 65-28a08; K.S.A. 65-1130.  On the contrary, Kansas law appears to require that the physician supervise the physician assistant, not the other way around.  *See* K.S.A. 65-28a08(a); *see also* K.S.A. 65-2872(m) (indicating nurses do not practice medicine).  Defendant is not obligated to make an accommodation which would violate the law.

Further, the cost of this accommodation is not reasonable.  If Stormont Vail could hire an APRN or PA to supervise Plaintiff and work alongside him (and as stated before, legally, it cannot), it would cost Defendant between $112,050.00 and $225,432.00.  Even without information to consider the overall financials of the institution, this is an excessive cost.  If Stormont Vail were to hire another physician to supervise Plaintiff (which is a more legally sound option in terms of licensing), it would cost Defendant between $458,625.00 and $1,473,958.00.  Again, this is a tremendously burdensome cost.  This requested accommodation is both an undue burden and unreasonable.

### 2.   Reassignment to Administrative Position

If Plaintiff could not be reassigned to an outpatient physician position, he also argues that he could have been accommodated by reassignment to an administrative position which would not require patient care.  (Doc. 50 at 23–26.)   Plaintiff contends that he was qualified without accommodations to work in several administrative positions available at Stormont Vail.  (*Id.* at 26.)   Defendant contends that Plaintiff caused a breakdown in the interactive process by abandoning discussions of reassignment to an administrative position.  (Doc. 47 at 17–18.) Plaintiff responds that he would have accepted an administrative position at any point in the process and points to several jobs that were open between April and October of 2021 that he believes he was qualified to perform.   (Doc. 50 at 19–20.)   Defendant argues that the uncontroverted facts show that Plaintiff abandoned any request for reassignment to an administrative position and that he cannot now rehabilitate himself by saying he would have accepted an administrative position.  (Doc. 54 at 7, 9–10.)   Additionally, Defendant argues that Plaintiff cannot show he was qualified to perform any of the open administrative positions.  (*Id.* at 13–14.)

As explained above, reassignment to a vacant position can be a reasonable accommodation in certain situations.  *Herrmann*, 21 F.4th at 674–75.  Plaintiff must make a showing of his prima facie case, including that he engaged in discussions with his employer in good faith to identify a position he was qualified to perform, with or without accommodations.  *Id.*  Plaintiff cannot make this showing.

The uncontroverted facts show that Plaintiff engaged in the interactive process primarily through his attorney during the late spring and summer of 2021.  In June 2021, Plaintiff requested reassignment to an administrative position.   Defendant responded and requested to set up a

conference call between the parties and attorneys to discuss Plaintiff's qualifications and the positions available.  That conference call never occurred, and Plaintiff did not again ask about reassignment to an administrative position.  In fact, Plaintiff requested (through his attorney) reassignment to an outpatient position or a monetary payment in September 2021, just before the mediation.  The facts show that Plaintiff stopped pursuing a reassignment to an administrative position.

Plaintiff attempts to rehabilitate his claim by providing an affidavit indicating that he "would have accepted reassignment to any of the vacant administrative positions . . . because [his] long-term disability benefits will expire in September of 2023, and because [his] pension and social security benefits would not have been affected." (Doc. 51 at 27.)  Yet in summer of 2021, Plaintiff did not have a conference call with Defendant and did not further inquire about vacant administrative positions.  And when Defendant presented a door screener position as a potential option to Plaintiff at the mediation in September 2021, he did not accept that position.  Plaintiff cannot now argue that he pursued reassignment to an administrative position in good faith when he completely abandoned that accommodation during the interactive process.

Because Plaintiff cannot show that he engaged in the interactive process regarding this potential accommodation in good faith, he cannot make prima facie showing of failure to accommodate as to reassignment to an administrative position.

### B.  Retaliation

As to Plaintiff's retaliation claim, Plaintiff argues that he engaged in protected activity when he requested a reasonable accommodation and filed a charge of discrimination and was retaliated against for engaging in that protected activity.  (Doc. 45 at 12.)  Specifically, Plaintiff alleges that he was retaliated against when Defendant did not grant him a reasonable

accommodation and when Defendant terminated his employment.  (*Id.*)  The court addressed Plaintiff's concerns about reasonable accommodations above and will not address them further. *Johnson v. Norton Cnty. Hosp.*, 550 F. Supp. 3d 937, 961 (D. Kan. 2021) ("Plaintiff also asserts in the pretrial order that defendant retaliated against her for requesting an accommodation by 'putting her on a rigid schedule that did not accommodate her needs' and 'reducing her full-time position to a part-time schedule.'  But these allegations are superfluous in light of her failure-to-accommodate claim.").

Plaintiff alleges he was terminated from his employment in retaliation for requesting reasonable accommodations and for filing an administrative charge.  (Doc. 45 at 12.)  Plaintiff also notes that his termination occurred on the same date as the mediation which took place during the administrative phase of this case before the lawsuit was filed.  (Doc. 50 at 28.)  Defendant contends that Plaintiff has waived the argument that he was terminated in retaliation for his participation in the mediation because he did not include that argument or any facts to support it in the pretrial order.  (Doc. 54 at 14.)  Defendant also argues that Plaintiff's argument (that the reasons Defendant provided for Plaintiff's termination were pretextual) is waived or in the alternative, fails.  (*Id.* at 14–15.)

Plaintiff filed his charge of discrimination on July 1, 2021.  Individuals at Stormont Vail learned the charge had been filed sometime on or before July 9, 2021.  Mediation for the charge took place on September 15, 2021.  In between the time the charge was filed and when mediation was held, Plaintiff and Defendant's attorneys were in communication trying to negotiate a resolution.  At mediation, the parties discussed potential reassignment to a door screener position, but Plaintiff refused that reassignment.  The parties also discussed Plaintiff's employment status and whether he would continue to be employed.  Ultimately, Defendant elected to terminate

Plaintiff's employment effective September 15, 2021, because (1) Plaintiff "had not maintained privileges, (2) he had not provided full-time professional services [f]or almost a year, (3) he had not provided on-call services for almost a year, and (4) his disability prevented him from performing the duties detailed in his employment contract."  (Doc. 47 at 28.)

To make a prima facie case of retaliation under the ADA, Plaintiff must show that (1) he engaged in protected activity; (2) a reasonable employee would find the action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action.  *Winston v. Ross*, 725 F. App'x 659, 664 (10th Cir. 2018) (citing *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011)).  If Plaintiff can establish a prima facie case, then Defendant can rebut it by showing a legitimate nondiscriminatory reason for the adverse action.  *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007).  Then the burden shifts back to Plaintiff to show that the stated reason is mere pretext.  *Id.*

The first element requires Plaintiff to show he engaged in protected activity.  There is no dispute that Plaintiff engaged in protected activity when he filed his charge of discrimination.  Defendant argues that Plaintiff cannot rely specifically on his participation in the mediation on September 15 as protected activity because he did not make that allegation in the pretrial order.  (Doc. 54 at 14; Doc. 45.)  Plaintiff argues that his participation in a "specific litigation activity" on the exact date his termination was effective shows temporal proximity which suggests causation.  (Doc. 50 at 29.)  Plaintiff cites *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1184 (10th Cir. 2002), for the proposition that Plaintiff's participation in mediation constitutes "specific litigation activity."  In *Hysten*, the court explained:

> We intimate no opinion regarding this contention [that the retaliatory action occurred 6 days after the specific litigation activity] except to say that the proximity between a specific litigation activity and the alleged retaliatory act is meaningless unless those who caused the alleged retaliatory act to occur are shown to have been

> aware of the specific activity. . . . Plaintiff does not make this showing, and thus, we agree that summary judgment is appropriate.

*Id.*  While it is true that Plaintiff participated in specific litigation activity, the mediation, on the same day his termination was effective, Defendant correctly notes that Plaintiff did not identify "participation in mediation" as protected activity in the pretrial order.  (*See* Doc. 45 at 12.)  The pretrial order controls the litigation from the time it is entered going forward.  *Wilson v. Muckala*, 303 F.3d 1207, 1215–16 (10th Cir. 2002); *see also* Fed. R. Civ. P. 16(d).  Thus, Plaintiff cannot rely on his participation in mediation alone as establishing temporal proximity.

Plaintiff preserved his argument that the filing of the charge was a protected activity and that there is close temporal proximity between the filing of the charge and his termination.  (*See* Doc. 45 at 12.)  To reiterate, Plaintiff filed his charge of discrimination on July 1, 2021, and his termination was effective September 15, 2021, approximately a two and a half month time gap between the protected activity and the adverse action.  A temporal proximity of one and a half months has been found to be close enough in time to show causation.  *Fisher v. Basehor-Linwood Unified Sch. Dist. No. 458*, 460 F. Supp. 3d 1167, 1205–06 (D. Kan. 2020), *aff'd*, 851 F. App'x 828 (10th Cir. 2021) ("The Tenth Circuit has held that a one and one-half month period – about the same interval here between plaintiff filing her EEOC Charge and her job termination – may, by itself, establish causation.") (internal quotation omitted).  But three months between the protected activity and the adverse employment action has been determined to be not close enough.  *Winston v. Ross*, 725 F. App'x 659, 665 (10th Cir. 2018) (citing *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007)).  The court assumes without deciding that two and a half months is close enough to show causation, as it determines below that Plaintiff fails to show pretext.

Defendant argues that Plaintiff has waived his right to argue that Defendant's reasons were mere pretext because Plaintiff did not argue pretext in the pretrial order and did not include any of

the facts he relies on to show pretext in the pretrial order.  (Doc. 54 at 14.)  Defendant asserted that

it had legitimate non-discriminatory business reasons for Plaintiff's termination in the defenses it

listed in the pretrial order.  (Doc. 45 at 13.)  Plaintiff did not include any of the facts necessary to

form his pretext argument or indicate that he intended to make a pretext argument in the pretrial

order, so he is making that argument for the first time in his response to Defendant's motion for

summary judgment.

       "Claims, issues, defenses, or theories of damages not included in the pretrial order are

waived."  *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting

*Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).  While pretrial orders

are intended to be liberally construed, "the primary purpose of pretrial orders is to avoid surprise

by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial

will be.'"  *Id.* (quoting *Cortez*, 460 F.3d at 1276).  Here, Defendant faces unfair surprise at

Plaintiff's pretext argument.  To be fair, Defendant likely could have or should have anticipated

that Plaintiff would make a pretext argument in light of Defendant's defense that it had legitimate

business reasons for terminating Plaintiff.[7]  But without Plaintiff identifying the facts he relies on

for pretext, Defendant was caught by surprise as to the specifics of this argument.  Plaintiff

reasonably should have known at the time of drafting the pretrial order that he would make a

pretext argument, particularly in light of the fact that Defendant identified its legitimate business

reasons for the termination as a defense in the pretrial order.  Plaintiff cannot now make an

argument not made in the pretrial order supported by facts not identified in the pretrial order.  The

court determines that the pretext argument fails because it was not disclosed.  Accordingly,

---

[7] Plaintiff included facts related to his pretext arguments in the Amended Complaint, which likely gave Defendant notice of this argument.  (*See* Doc. 23 at 12–13.)  But the pretrial order controls, and Defendant could have reasonably understood that Plaintiff was abandoning his claims of pretext.  *Wilson v. Muckala*, 303 F.3d 1207, 1215–16 (10th Cir. 2002).

because Defendant has shown legitimate, non-discriminatory reasons for Plaintiff's termination and because Plaintiff has not shown pretext, Plaintiff's retaliation claim fails.

### C.  Unlawful Termination

Plaintiff argues that he was intentionally discriminated against because of his disability when Defendant terminated his employment.  (Doc. 45 at 12.)  Defendant contends that Plaintiff was not qualified to do his job and that his disability prevented him from performing his duties with or without an accommodation.  (Doc. 47 at 29.)  Plaintiff relies on the pretext argument from the retaliation section above as sufficient to raise a genuine dispute of fact.  (Doc. 50 at 30–31.)

Plaintiff must make a showing of the following elements to survive summary judgment: (1) he was disabled; (2) he was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (3) he was terminated because of his disability.  *Hermann*, 21 F.4th at 678.  As the court concluded in its analysis related to the failure to accommodate claim, Plaintiff is not qualified to perform the essential functions of his job as a hospitalist because he poses a direct threat to patients.  Plaintiff even conceded he could no longer work as a hospitalist. And even if Plaintiff could make the prima facie showing required, Defendant has asserted legitimate, non-discriminatory business reasons for the termination and Plaintiff has waived his pretext argument.  Accordingly, the court concludes that Plaintiff's unlawful termination claim fails.

### D.  Breach of Contract

Plaintiff contends that Defendant violated his employment contract by failing to reasonably accommodate his disability and by terminating him.  (Doc. 45 at 12.)  This claim is redundant of Plaintiff's claims for failure to accommodate and for unlawful termination.  The employment contract required Defendant to abide by the ADA and the RA and to reasonably accommodate

Plaintiff if possible.  Because the legal analysis is substantially the same for this claim as for the claims above, the court need not address this claim further.  Plaintiff's breach of contract claim fails.

**IV.    Conclusion**

For the above reasons, Defendant's motion for summary judgment (Doc. 46) is GRANTED.

IT IS SO ORDERED this 9th day of June, 2023.


    s/ John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE